Laura P. Lunn (OR 181840)
Conor Gleason (NY 5109962)
ROCKY MOUNTAIN IMMIGRANT ADVOCACY NETWORK
7301 Federal Boulevard, Suite 300
Westminster, Colorado 80030
Tel: (720) 370-9100
llunn@rmian.org
cgleason@rmian.org

*Pro Bono Counsel for Petitioner*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| **MOHAMED SHEIKH,** | |
| *Petitioner*, | Case No. _____ |
| v. | |
| **JOHNNY CHOATE,** in his official capacity as warden of the Aurora Contract Detention Facility owned and operated by GEO Group, Inc.; | |
| **JOHN FABBRICATORE,** in his official capacity as Field Office Director, Denver, U.S. Immigration & Customs Enforcement; | **VERIFIED PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241** |
| **ALEJANDRO MAYORKAS,** in his official capacity as Secretary, U.S. Department of Homeland Security; | *Oral Argument Requested* |
| **TAE D. JOHNSON,** in his official capacity as Acting Director of Immigration & Customs Enforcement (ICE); | |
| **MERRICK GARLAND,** in his official capacity as Attorney General, U.S. Department of Justice. | |
| *Respondents.* | |

## INTRODUCTION

1. Mohamed Sheikh ("Mr. Sheikh") entered the United States as a refugee approximately 25 years ago when he was only eight years old. He fled Somalia alongside his mother after witnessing the murder of his father and cousin, his mother being severely beaten, and experiencing profound hunger and suffering in a Kenyan refugee camp. Two decades later, Mr. Sheikh adjusted his status to become a lawful permanent resident ("LPR") in the United States. He is now age 33 and has strong family ties in Salt Lake City, Utah, including five U.S. citizen family members, including his mother, stepfather, and three younger siblings. Mr. Sheikh was diagnosed with Schizoaffective Disorder, Bipolar Type; Posttraumatic Stress Disorder; Depression; and Anxiety. Ex. K at 56, 60, 67. These diagnoses have direct ties to the trauma he suffered as a young boy as well as the product of being raised by a woman who lived through a brutal dictatorship and the ways in which her lived experiences shaped her approach to parenting. *Id.* Though the Department of Homeland Security ("DHS") initiated removal proceedings against Mr. Sheikh, he contests the immigration judge's ("IJ") erroneous finding of removability, and that decision is currently on appeal before the Board of Immigration Appeals ("BIA"). He thus remains an LPR unless that finding becomes final. Moreover, at Mr. Sheikh's merits hearing, DHS agreed that he will more likely than not face torture if forced to return to Somalia and therefore DHS cannot effectuate his removal there. Nevertheless, Mr. Sheikh remains detained as he exercises his appellate rights, and now seeks review of DHS's decision to continue his detention.

2. DHS detained Mr. Sheikh on June 29, 2021, at the Logan County Jail in Utah and soon thereafter transferred him to the Aurora Contract Detention Facility[1] ("Aurora facility") located in Aurora, Colorado. As of this writing, DHS has detained Mr. Sheikh for 366 days with no timeline for release and his prolonged deprivation of liberty is not justified. Absent intervention from this Court, his detention – which remains unreviewed by a neutral adjudicator – will continue indefinitely.

3. Through this petition, Mr. Sheikh challenges his continued detention without individualized review as violative of the Due Process Clause of the Fifth Amendment because it is unreasonably prolonged.

4. Mr. Sheikh further alleges his detention without an individualized bond hearing violates the Administrative Procedures Act ("APA") because he is entitled to such a hearing pursuant to the Executive Office for Immigration Review ("EOIR") National Qualified Representative Program ("NQRP") nationwide policy, through which he was appointed counsel given an IJ determined him incompetent to represent himself in his removal proceedings.

5. Accordingly, Mr. Sheikh seeks a writ of habeas corpus ordering his release unless he immediately receives a bond hearing before an IJ at which DHS bears the burden of justifying his continued detention by clear and convincing evidence and where the IJ considers his ability to pay any bond amount and alternatives to detention.

---

[1] The Aurora facility is also referred to as the Denver Contract Detention Facility. These names are used interchangeably by DHS, and both refer to the facility located a 3130 N. Oakland Street, Aurora, Colorado, 80010.

## PARTIES

6.   Mr. Sheikh fled civil war in Somalia and entered the United States as a refugee at age eight.
     He is incarcerated by Immigration and Customs Enforcement ("ICE"), a subagency within
     DHS, and has been held without bond or access to an independent review of his custody at
     the Aurora facility located at 3130 N. Oakland St., Aurora, CO 80010 for 366 days. On
     March 21, 2022, an IJ at the Aurora Immigration Court conducted a hearing to rule on Mr.
     Sheikh's removability and found him removable for having been convicted of two or more
     crimes involving moral turpitude ("CIMT"). At a hearing on April 6, 2022, DHS indicated
     it would stipulate to Mr. Sheikh's eligibility for protection under the implementing
     regulations of the Convention Against Torture and the court entered an order deferring his
     removal to Somalia. On April 28, 2022, Mr. Sheikh appealed the judge's determination to
     the Board of Immigration Appeals ("BIA"), contesting the IJ's CIMT findings and arguing
     that the court erred in finding him removable and ineligible to maintain his permanent
     residency. Mr. Sheikh's appeal is pending and, even though DHS acknowledges it cannot
     remove Mr. Sheikh to his country of origin, it continues to detain him as he exercises his
     right to appellate review. Concurrently, Mr. Sheikh has diagnoses including
     Schizoaffective Disorder, Bipolar Type; Posttraumatic Stress Disorder; Depression;
     Anxiety and is an individual with a disability as that term is used in 29 U.S.C. § 705(9)(B)
     & (20)(B). *See* 28 C.F.R. § 35.108. Mr. Sheikh challenges Respondents' failure to: (1)
     provide constitutionally adequate bond hearing as required by the Fifth and Fourteenth
     Amendments; and (2) comply with the APA.

7. Respondent Johnny Choate is the Warden of the Aurora facility, where Mr. Sheikh is detained. Defendant Choate is a legal custodian of Mr. Sheikh. He is sued in his official capacity.

8. Respondent John Fabbricatore is the ICE Denver Acting Field Office Director. The Denver Field Office is responsible for carrying out ICE's immigration detention operations at all of Colorado's detention centers. Defendant Fabbricatore is a legal custodian of Mr. Sheikh. He is sued in his official capacity.

9. Respondent Alejandro Mayorkas is named in his official capacity as the Secretary of DHS. In this capacity he is responsible for the administration of the immigration laws pursuant to Section 402 of the Homeland Security Act of 2002. 107 Pub. L. 296 (November 25, 2003); *see also* 8 U.S.C. § 1103(a); routinely transacts business in the District of Colorado; supervises Respondent Fabbricatore; and is legally responsible for the pursuit of Mr. Sheikh's incarceration and removal. He is therefore a custodian of Mr. Sheikh. Respondent Mayorkas' office is located at DHS headquarters in Washington, DC, 20528.

10. Respondent Tae D. Johnson is the Acting Director of ICE. As the head of ICE, he is responsible for decisions related to detaining and removing certain noncitizens, Director Johnson is a legal custodian of Mr. Sheikh.

11. Respondent Merrick Garland is named in his official capacity as the Attorney General of the United States. He is responsible for the administration of the immigration laws as exercised by EOIR, pursuant to 8 U.S.C. § 1103(g). He routinely transacts business in the District of Colorado and is legally responsible for administering Mr. Sheikh's removal and bond proceedings as well as the procedural standards used in those proceedings. He is

therefore a legal custodian of Mr. Sheikh. Respondent Garland's office is at DHS of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530.

## JURISDICTION AND VENUE

12. Respondents incarcerated Mr. Sheikh on June 28, 2021, in Aurora, Colorado and he is under the direct control of Respondents and their agents.

13. This action arises under the Constitution of the United States, the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.* and the Administrative Procedure Act ("APA"), 5 U.S.C. § 700 *et seq*.

14. Federal courts have subject matter jurisdiction under 28 U.S.C. § 2241(c)(1) and (c)(3) (habeas corpus) to determine whether people imprisoned in federal custody are held in violation of law. *INS v. St. Cyr*, 533 U.S. 289, 305 (2001); *Boumediene v. Bush*, 128 S.Ct. 2229, 2248 (2008) (citing *St. Cyr*).

15. Jurisdiction is also proper pursuant to 28 U.S.C. § 1331 (federal question); 5 U.S.C. § 702 (waiver of sovereign immunity); 28 U.S.C. § 1346 (original jurisdiction); Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause); the All Writs Act, 28 U.S.C. § 1651; and 28 U.S.C. §§ 2201-2202 (Declaratory Judgement Act).

16. Further, the Court has jurisdiction to grant injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, 1651, 2241, and the All Writs Act, 28 U.S.C. § 1651, and the APA, 5 U.S.C. § 702. Mr. Sheikh's detention constitutes a "severe restraint[] on [his] individual liberty" interest such that Mr. Sheikh is "subject to restraints not shared by the public generally" and "in custody in violation of the . . . laws . . . of the United States." *See Hensley v. Municipal Court*, 411 U.S. 345, 351 (1973); 28 U.S.C. § 2241; *see also Fay v. Noia*, 372 U.S. 391, 430–31 (1963).

17. While only federal courts of appeals have jurisdiction to review removal orders through petitions for review, 8 U.S.C. § 1252(a), the federal district courts have jurisdiction to hear habeas corpus claims by noncitizens challenging the lawfulness of their detention by DHS. *Jennings v. Rodriguez*, 138 S. Ct. 830, 839–41 (2018); *Demore v. Kim*, 538 U.S. 510, 516–17 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

18. Venue properly lies in the District of Colorado. 28 U.S.C. §§ 1391(b)(2), (e); 2241. This petition is filed while Mr. Sheikh is physically present within the district, as he is incarcerated by Respondents Choate and Fabbricatore at the Aurora facility in Aurora, CO. The material events leading to Mr. Sheikh's detention and removal proceedings also occurred in the District of Colorado: he was in immigration proceedings in Aurora Colorado, instigated by the Denver Field office of ICE Enforcement and Removal Operations, prosecuted by the Office of Chief Counsel for ICE in Centennial, CO, and presided over by an IJ located in Aurora, CO; he also has Colorado-based counsel. The place of employment of Respondent Choate is at the Aurora Contract Detention Facility, located at 3130 N. Oakland Street, Aurora, CO 80010. The place of employment of Respondent Fabbricatore is also located within the district, at 12445 East Caley Ave, Centennial, CO 80111. *See* 28 U.S.C. §§ 1391(b)(2) and (e); 2241(d); *Braden v. 30th Judicial Circuit*, 410 U.S. 484, 493–94 (1973) (laying out traditional venue factors).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

19. Exhaustion is not required because Congress did not codify a requirement that petitioners seeking a writ of habeas corpus exhaust administrative remedies. *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("Where Congress specifically mandates, exhaustion is

required… But where Congress has not clearly required exhaustion, sound judicial discretion governs.") (citation omitted).

20. While inapplicable here, some situations require a Petitioner to exhaust administrative remedies prior to seeking a writ under § 2241. *Baquera v. Longshore*, 948 F. Supp. 2d 1258, 1259 (D. Colo. 2013) (citing *Williams v. O'Brien*, 792 F.2d 986, 987 (10th Cir. 1986) (per curiam)) *abrogated on different grounds by Nielsen v. Preap*, 139 S.Ct. 954 (2019). However, exhaustion of remedies is unnecessary if futile. *Goodwin v. State of Okl.*, 923 F.2d 156, 157 (10th Cir. 1991) (finding that exhaustion is not required due to futility where the state's highest court recently decided the precise legal issue petitioner raised in his federal habeas petition).

21. Here, exhaustion would be futile because the detention statute does not provide for a bond hearing when an individual is held pursuant to 8 U.S.C. § 1226(c) and IJs lack jurisdiction to render an individualized custody determination for individuals incarcerated pursuant to that statute. 8 U.S.C. § 1226(c); *Valerga v. Holder*, No. 13-CV-03014-PAB, 2014 WL 103551, at *3 (D. Colo. Jan. 9, 2014) (determining exhaustion to be futile for persons in immigration detention whose cases are determined to be subject to mandatory detention under 8 U.S.C. § 1226(c)).

22. Further, EOIR, the agency housing the nation's immigration courts and appellate body, already decided against Mr. Sheikh's argument that DHS must shoulder the burden by clear and convincing evidence that those it jails must remain incarcerated. *Matter of R-A-V-P-*, 27 I. & N. Dec. 803 (BIA 2020) (concluding that the noncitizen's "assertion that the DHS should bear the burden . . . lacks merit because we have *clearly* held that [the statute] places the burden of proof on the [noncitizen] to show that he merits release on bond") (emphasis

added) (citations omitted); *Matter of Fatahi*, 26 I. & N. Dec. 791, 795 n. 3 (BIA 2016) (finding that the BIA has "consistently held that [noncitizens] have the burden to establish eligibility for bond while proceedings are pending"). Requesting EOIR to review Mr. Sheikh's detention "would be to demand a futile act." *Houghton v. Shafer*, 392 U.S. 639, 640 (1968) (finding that requiring the petitioner to exhaust administrative remedies was futile because the attorney general already decided that the rules were appropriately applied to the petitioner).

23. Moreover, EOIR lacks authority to rule on the constitutionality of the immigration statutes, and both the immigration courts and BIA lack jurisdiction to interpret issues beyond the scope of the INA and its corresponding regulations. *Matter of G-K-*, 26 I. & N. Dec. 88 (BIA 2013); *Matter of Valdovinos*, 18 I. & N. Dec. 343, 345–46 (BIA 1982) (disclaiming jurisdiction to rule on the constitutionality of an immigration statute).

24. Further, EOIR's NQRP nationwide policy affords a bond hearing to prevent prolonged detention without meaningful review. It applies to individuals who are "unrepresented detained [noncitizens] who were initially identified as having a serious mental disorder or condition that may render them incompetent to represent themselves and who have been held in detention by DHS for six months or longer will be afforded a bond hearing." Ex. A at 2. However, in an unpublished case, the BIA acknowledged that the right to a bond hearing exists but found that the NQRP nationwide policy does not overcome lack of jurisdiction pursuant to 8 U.S.C § 1226(c), the mandatory detention statute. Ex. F at 31–32. Accordingly, it would be futile for Mr. Sheikh to appeal the immigration judge's decision regarding lack of jurisdiction to the BIA and he sufficiently exhausted all possible administrative remedies prior to seeking a writ under § 2241.

25. Even if meaningful administrative remedies were promptly available, Mr. Sheikh, as a noncitizen challenging the lawfulness of his ongoing immigration detention, is not required to exhaust those remedies under 8 U.S.C. § 2241. *See, e.g.*, *Louisaire v. Muller*, 758 F. Supp. 2d 229, 234 (S.D.N.Y. 2010).

26. There are therefore no administrative mechanisms through which Mr. Sheikh can seek a neutral review of whether his ongoing and prolonged detention is justified. Further exhaustion is not required.

27. Regardless of whether Mr. Sheikh's potential attempt to exhaust administrative remedies would be futile—which it would be—Mr. Sheikh exhausted the limited administrative remedies available to him. Mr. Sheikh filed a motion for a custody redetermination hearing on May 11, 2022. On May 24, 2022, the IJ conducted a hearing but found Mr. Sheikh subject to mandatory detention, and that she lacked jurisdiction to conduct an individualized analysis of his request for release. Mr. Sheikh also sought release from custody from DHS, which the agency denied on May 19, 2022.

28. Therefore, exhaustion is satisfied because: (a) Congress did not require exhaustion under the circumstances; (b) Mr. Sheikh exhausted the remedies available to him; and (c) any further pursuit of administrative remedies would be futile.

## STATUTORY TEXT AND FRAMEWORK

### I.      Immigration Proceedings & DHS Detention

29. Congress authorized civil detention of noncitizens in removal proceedings for specific, non-punitive purposes. *Jennings*, 138 S.Ct. at 841; *Demore*, 538 U.S. at 515–16; *Zadvydas*, 533 U.S. at 690. Detention is either discretionary, 8 U.S.C. § 1226(a), or mandatory, §§ 1225(b), 1226(c), 1231(a).

30. Under the discretionary detention statute, noncitizens may request a bond hearing at any time to contest whether they are a danger or a flight risk and thus properly detained during the pendency of their removal proceedings. 8 U.S.C. § 1226(a). Conversely, § 1226(c) requires DHS to detain noncitizens in removal proceedings convicted of certain crimes, § 1225(b) mandates DHS to detain certain noncitizens seeking admission to the United States at a port of entry, and § 1231(a) necessitates detention of certain noncitizens subjected to final orders of removal.

31. The IJ adjudicating Mr. Sheikh's removal and custody proceedings found Mr. Sheikh subject to 8 U.S.C. § 1226(c), which provides in relevant part:

> The Attorney General shall take into custody any [noncitizen] who—
>
> (A) is inadmissible by reason of having committed any offense covered in 1182(a)(2) of this title,
> (B) is deportable by reason of having committed any offense covered in 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
> (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the [noncitizen] has been sentence[d] to a term of imprisonment of at least 1 year or,
> (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title, when the [noncitizen] is released, without regard to whether the [noncitizen] is released on parole, supervised release, or probation, and without regard to whether the [noncitizen] may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c)(1). Paragraph (c)(2) of § 1226 provides that the Attorney General may only release a noncitizen "described in paragraph (1)" under narrow circumstances not applicable here.

## II. Judicial Competency Inquiries in Immigration Court and the National Qualified Representative Nationwide Policy

32. In immigration proceedings, IJs assess whether respondents can represent themselves by conducting a Judicial Competency Inquiry ("JCI"). Such an inquiry is initiated if the

respondent exhibits an indicia of incompetency, in which case, DHS as the custodian is responsible for providing medical records to aid the court in its assessment. *Matter of M-A-M-*, 25 I. & N. Dec. 474, 480 (BIA 2011) ("The DHS has an obligation to provide the court with relevant materials in its possession that would inform the court about the respondent's mental competency."). Neither party bears the burden of proving whether the noncitizen is competent. *Matter of J-S-S-,* 26 I. & N. Dec. 679 (BIA 2015).

33. In many instances, when an IJ is unsure of the respondent's competency, the court may order a competency evaluation conducted by a mental health professional. Should the court determine – either solely by its own inquiry or with the opinion of an expert – that the respondent is not competent, the IJ will order the provision of a qualified representative under the NQRP nationwide policy. Ex. A at 1–2. This agency policy is the only way through which an individual can obtain court appointed legal representation at the federal government's expense in immigration proceedings apart from when such representation is mandated through the *Franco* injunction. *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG DTBX, 2013 WL 3674492, at *2 (C.D. Cal. Apr. 23, 2013).

34. EOIR enacted the NQRP nationwide policy in light of litigation filed in 2010 in the U.S. District Court for the Central District of California. In *Franco*, a group of individuals with mental disabilities who DHS incarcerated in immigration prison filed a class action complaint alleging that due to their disabilities they were not competent to defend their rights in immigration removal proceedings. Yet, immigration courts forced them to proceed without representation although they failed to comprehend the nature of the removal proceedings and lacked the ability to meaningfully represent themselves. *Franco-Gonzales v. Holder*, 767 F. Supp. 2d 1034, 1037 (C.D. Cal. 2010). On April 23, 2013, the district

court entered a permanent injunction in *Franco*, making certain reforms mandatory for immigrants detained in the Ninth Circuit who received a JCI hearing. *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG DTBX, 2013 WL 3674492, at *2 (C.D. Cal. Apr. 23, 2013).

35. EOIR, in collaboration with DHS, issued the NQRP nationwide policy on April 22, 2013. Ex. A–C at 1–6. The purpose was "to provide enhanced procedural protections, including competency inquiries, mental health examinations, and bond hearings to certain unrepresented and detained respondents with serious mental disorders or conditions that may render them incompetent to represent themselves in immigration proceedings." U.S. Dep't of Justice, National Qualified Representative Program (NQRP), (Feb. 18, 2020), https://www.justice.gov/eoir/national-qualified-representative-program-nqrp. The procedural protections afforded by this policy also provides for the provision of court-appointed counsel called a Qualified Representative ("QR") "to certain unrepresented and detained respondents who are found by an Immigration Judge or the BIA to be mentally incompetent to represent themselves in immigration proceedings." *Id.*

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### I.     Mr. Sheikh is a Refugee and has Severe Mental Illness

36. Just before civil war broke out, Mr. Sheikh was born in Somalia on January 24, 1989. His first memories are disorganized but firmly etched in his mind. His second to last memory of his father involves his dad giving him money when he was very young, which made him feel special and important. His final recollection is of his father's murder by rival clan members during civil war. Mr. Sheikh does not remember how old he was at the time, but after also witnessing the murder of his cousin, he and his mother fled to a refugee camp in

Kenya. There, Mr. Sheikh recalls his mother fighting hard to keep them alive, despite a shortage of food. His memory is filled with images of his mother being beaten as she worked to keep him safe, often forgoing meals to be sure Mr. Sheikh had enough food to survive.

37. When he was only eight years old, on or about September 12, 1997, he and his mother fled the squalor of the refugee camp and were admitted to the United States as refugees. The two settled in Salt Lake City, Utah, where his mother remarried and gave birth to three more children. Although much safer in the United States, Mr. Sheikh nevertheless had a challenging childhood. He experienced undiagnosed symptoms of mental illness and was often blamed for his poor behavior, which was attributed to personal flaws, rather than having access to the support he needed given his turbulent upbringing in Somalia and Kenya. At no point did Mr. Sheikh receive medication to treat the symptoms of his mental illness until after being incarcerated in criminal custody.

38. In prison, Mr. Sheikh first began to access psychological care. He currently has diagnoses for Schizoaffective Disorder, Bipolar Type; Posttraumatic Stress Disorder; fixed delusions; Depression; and Anxiety. He continues to receive medication while jailed by ICE and is extremely motivated to remain medicated. He has gained tremendous insight into the nature of his mental illness and how it has impacted his life up to this point. He is energized to return to Salt Lake City and while he wants to be close to his mother, stepfather, and siblings, he plans to enroll in "residential services at ValleyEPIC (Evidence-Based Programs and Interventions Campus), a continuum of treatment for people struggling with substance use disorders, mental illness, homelessness, or a combination of these factors." Ex. L at 66, ¶ 30.

**II.      Arrest by DHS and Mr. Sheikh's Immigration Court Proceedings**

39. On February 11, 2016, DHS initiated removal proceedings against Mr. Sheikh and a month later an IJ entered an order of deportation, which was later reopened in January 2017. On April 26, 2017, the Chicago Immigration Court granted Mr. Sheikh adjustment of status to lawful permanent resident, finding that Mr. Sheikh merited a favorable exercise of discretion and should therefore remain in the United States as an LPR.

40. On January 8, 2019, Mr. Sheikh was convicted in Salt Lake City of Assault Causing Substantial Bodily Injury under Utah Annotated Code ("U.A.C.") § 76-5-102. On June 22, 2020, Mr. Sheikh was convicted in Salt Lake City for Receive or Transfer Stolen Vehicle under U.A.C. § 41-1a-1316. It is based on those two convictions that DHS reinitiated removal proceedings against Mr. Sheikh.

41. DHS arrested Mr. Sheikh on June 29, 2021, in Utah and transferred him to the Aurora facility where he has been held since that time. DHS did not present Mr. Sheikh before an IJ until two weeks after it decided to jail him and failed to issue a charging document, known as a Notice to Appear ("NTA"), in his case until July 21, 2021—a full 21 days after his arrest.[2] That same day, Mr. Sheikh was scheduled to appear before the court but through no fault of his own, his hearing was moved to August 4, 2021. In sum, Respondents failed to present Mr. Sheikh before an IJ and give him notice of the charges against him until 37 days after DHS incarcerated him.

A.   <u>Competency Hearing</u>

---

[2] The NTA is an essential document in removal proceedings which, *inter alia*, provides noncitizens with notice of the allegations and charges against them. *See* 8 U.S.C. § 1229(a).

42. As Mr. Sheikh waited in custody for almost a month, on July 26, 2021, DHS filed a Motion for Consideration of Health Records, indicating that Mr. Sheikh demonstrated indicia of incompetency. *Matter of M-A-M-*, 25 I. & N. Dec. at 480.

43. On August 6, 2021, Mr. Sheikh appeared before the IJ who then ordered a competency evaluation. While that was pending, Mr. Sheikh's case was twice more scheduled and reset by the court. On September 8, 2021, the Court held a hearing and ordered the provision of a QR to serve as counsel to Mr. Sheikh in his removal proceedings, pursuant to the NQRP nationwide policy. The case was reset by the court for a fourth time in October 2021, and Mr. Sheikh's court-appointed counsel appeared with him on October 18, 2021 and sought a brief continuance for attorney preparation.

B. Merits Hearing

44. After the immigration court concluded its competency inquiry, between November 5, 2021, and January 24, 2022, it unilaterally reset Mr. Sheikh's case five times. On January 24, 2022, the IJ indicated she was inclined to terminate proceedings, finding that DHS did not meet its burden of establishing Mr. Sheikh's deportability. However, on January 27, 2022 – 212 days after the agency took Mr. Sheikh into its custody – DHS amended the allegations and raised new charges of removability, namely that Mr. Sheikh's 2019 and 2020 convictions were CIMTs.

45. On March 21, 2022 – 266 days after Mr. Sheikh was incarcerated – the IJ found that DHS met its burden of establishing that he has convictions for two or more CIMTs, rendering him removable, and then provided him the opportunity to apply for relief from removal. At a hearing on April 6, 2022, DHS stipulated that Mr. Sheikh merited relief pursuant to the Convention Against Torture, acknowledging that it could not remove Mr. Sheikh to

16

Somalia because doing so would more likely than not subject Mr. Sheikh to torture. The court then entered an order deferring Mr. Sheikh's removal—a full 281 days after DHS incarcerated Mr. Sheikh.

46. On April 28, 2022, Mr. Sheikh appealed the to the BIA contesting the IJ's CIMT findings and arguing that the court erred in finding him removable and ineligible to maintain his permanent residency. Even though DHS recognized Mr. Sheikh merits protection from torture and therefore cannot be removed to Somalia, it continues to detain him as he exercises his right to appellate review. Regardless of the outcome of Mr. Sheikh's appeal, he cannot be deported to Somalia because neither party appealed the IJ's conclusion that he will more likely than not face torture if sent back to Somalia.

47. Both parties submitted briefing to the BIA on June 3, 2022, and it will be at least three months before the BIA issues any type of decision. There are three possible outcomes before the BIA: (1) it sustains Mr. Sheikh's appeal, and no further action is needed; (2) it sustains the appeal and remands to the IJ; or (3) it dismisses the appeal and Mr. Sheikh will exercise his right to judicial review before the Tenth Circuit. It is impossible to predict how much time will pass before Mr. Sheikh reaches a conclusion to his immigration matters. In light of the uncertainty of when EOIR will ultimately issue a final order in Mr. Sheikh's case, he cannot anticipate how much longer he will remain imprisoned, making his confinement indefinite.

C.  Bond Hearing

48. On May 11, 2022, Mr. Sheikh, through counsel, filed a motion requesting a custody redetermination hearing before the Aurora Immigration Court. In part, Mr. Sheikh's motion was based on his right to a bond hearing after six months of detention, as afforded by the

NQRP nationwide policy. Ex. A at 2; Ex. C at 5–6 n. 2 (same); *see Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG DTBX, 2013 WL 3674492, at *2 (C.D. Cal. Apr. 23, 2013) (mandating an individualized bond hearing after 180 days of civil incarceration for qualifying class members, including those otherwise subject to mandatory detention).

49. In the present matter, Mr. Sheikh is protected by the heightened protections afforded under the NQRP nationwide policy, yet he continues to endure unreviewed imprisonment related to his immigration proceedings. The policy creates a mechanism for release from detention for situations like this: when someone with a serious mental illness is in DHS custody for six months or longer, it offers them a bond hearing. Ex. A at 2 ("…detained [noncitizens] who were initially identified as having serious mental disorder or condition that may render them incompetent to represent themselves and who have been held in detention by DHS for six months or longer will be afforded a bond hearing."); Ex. C at 6 ("EOIR's new policy also provides custody hearings to unrepresented detained [noncitizens] who were identified as having a serious mental disorder or condition that may render them incompetent to represent themselves and have been detained in ICE custody for six months or longer. ICE trial counsel shall participate in these custody hearings."). Both policy memos afford a bond hearing for people covered by the policy after six months of confinement. *Id.*

50. Yet, on May 24, 2022, an IJ declined to assume jurisdiction pursuant to 8 U.S.C. § 1226(c) based on her prior finding that Mr. Sheikh was removable. 8 U.S.C. § 1226(c)(1)(B) ("The Attorney General *shall* take into custody any [noncitizen] who . . . is deportable by reason of having committed any offense covered in section 237(a)(2)(A)(ii)"). Despite the clear direction provided by the agency memorandum, the IJ did not afford Mr. Sheikh the right to an individualized bond hearing after six months (or more) of confinement, as set forth

in the NQRP nationwide policy. Yet, at that same hearing, the IJ indicated that she would consider bond if she had the authority to do so.

51. Respondents have now incarcerated Mr. Sheikh for a year of his life without ever being required to demonstrate before a neutral adjudicator that his ongoing detention is necessary to prevent flight or danger to the community. This Petition follows.

### III.     Mr. Sheikh's Mental Health Would Improve if He Were Not Incarcerated

52. Mr. Sheikh recognizes the improvements in his mental health since accessing medication and wishes to expand on the progress made since starting treatment. Currently, Mr. Sheikh is being prescribed psychotropic medications and reports a heightened awareness of reality given he no longer is hearing voices or experiencing visual hallucinations. While he feels proud of the strides made, his physician explained to him the limitations of the medications available in ICE custody. Namely, he can only access generic forms of medication whereas if he were not detained his options would be broader and could more keenly target the symptoms of his mental illness while also resulting in fewer side effects. Mr. Sheikh is very hopeful that upon release from civil imprisonment he will gain access to the care he needs and deserves.

53. Although Mr. Sheikh is successful in accessing treatment for certain aspects of his mental disabilities, he is still experiencing profound impairments to his functioning due to the uncontrolled symptoms of his Depression and Anxiety. Mr. Sheikh currently experiences looping thoughts where he relives past harm. He reports that the primary cause of his depression and anxiety is not knowing how much longer he will remain imprisoned away from his family and the future he dreams of for himself. Mr. Sheikh recognizes that his ability to pursue his legal options depends on whether he is free. He is reluctantly pursuing

an appeal of the IJ's decision that he is removable in the first place, even though he acknowledges the strength of his arguments on appeal.

54. The severity of Mr. Sheikh's mental health is compounded by his deteriorated physical health. While detained in DHS custody his physical health has deteriorated significantly; he reports gaining 90 pounds because he is not motivated to move his body, wants to sleep all the time, does not have access to outdoor space, and the main source of comfort he experiences – other than speaking to his family – is through consumption of food.[3] Given his weight gain, even when he attempts to engage in sports he formerly loved, he feels discouraged by his slow and labored movement and the emotions he experiences further fuel his Depression and Anxiety.

55. When assessing how he feels being incarcerated by DHS, Mr. Sheikh reflected and reported feeling locked down, stating that immigration detention is worse than the conditions he experienced in either jail or prison. In particular, in ICE custody he does not have access to outside space, religious services, or other programing available in criminal custody.

56. In contrast, Salt Lake City has robust services for Mr. Sheikh. While in DHS custody, Mr. Sheikh is working with a social worker who supported him in planning for his future outside of detention, with a specific focus on delineating what services he will access upon release. *See generally* Ex. L.

## **LEGAL BACKGROUND**

---

[3] *See* Office of the Inspector General ("OIG") Report, Acting Inspector General John V. Kelly, "Concerns about ICE [] Treatment [of Detained Persons] and Care at Four Detention Facilities," (Jun. 3, 2019) *available at*: https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf (finding the Aurora facility is in violation of ICE detention standards because it does not provide outdoor space and recreation to persons incarcerated within the facility).

57. Respondents are subjecting Mr. Sheikh to prolonged detention without an individualized bond hearing based on an unconstitutional application of the mandatory detention scheme, 8 U.S.C. § 1226(c), while simultaneously failing to adhere to its own nationwide policy that affords individualized custody reviews to people like Mr. Sheikh. Ex. A–B. ICE detained Mr. Sheikh 366 days ago and a neutral arbiter has never reviewed that custody determination. Given neither Ms. Sheikh's release nor removal are reasonably foreseeable, he merits a constitutionally adequate bond hearing.

## I.    Prolonged Detention Without Judicial Review Violates Due Process

### A.    Due Process Requires Neutral Review of Liberty Determinations

58.  "It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in [removal] proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993).  "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" that the Due Process Clause protects. *Zadvydas*, 533 U.S. at 690. This fundamental protection applies to all persons present in the United States, including both removable and inadmissible noncitizens. *Id.* at 721 (Kennedy, J., dissenting) ("both removable and inadmissible [noncitizens] are entitled to be free from detention that is arbitrary or capricious"). Due process requires "adequate procedural protections" to ensure that the government's asserted justification for physical confinement "outweighs the [incarcerated] individual's constitutionally protected interest in avoiding physical restraint." *Id.* at 690 (internal citation omitted). Civil immigration detention is therefore constitutional only in "certain special and 'narrow' nonpunitive 'circumstances.'"  *Id.* at 690 (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). The Supreme Court identified

those limited circumstances as mitigating the risk of danger to the community and preventing flight. *Id.* at 690–91; *see also Demore*, 538 U.S. at 515, 527–28.

59. The Supreme Court has repeatedly recognized that civil detention must be carefully limited to avoid due process concerns and ensure the government's justifications for continued detention are legitimate. *E.g.*, *Kansas v. Hendricks*, 521 U.S. 346, 368 (1997) (upholding involuntary civil commitment of certain sex offenders but requiring "strict procedural safeguards" including a right to a jury trial and proof beyond a reasonable doubt); *Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996) ("[D]ue process places a heightened burden of proof on the State in civil proceedings in which the individual interests at stake . . . are both particularly important and more substantial than mere loss of money.") (citation and quotation marks omitted); *Foucha v. Louisiana*, 504 U.S. 71, 80–83 (1992) (striking civil detention statute because it placed the burden on the person in custody to prove eligibility for release); *Addington v. Texas*, 441 U.S. 418, 423 (1979) (state must justify civil detention of allegedly dangerous individual with mental illness by clear and convincing evidence); *see U.S. v. Salerno*, 481 U.S. 739, 750–52 (1987) (upholding federal bail statute permitting pretrial detention where statute required strict procedural protections, including prompt hearings where government bore the burden of proving dangerousness by clear and convincing evidence). It is of no consequence that these precedents are unrelated to immigration detention because "the 'constitutionally protected liberty interest' in avoiding physical confinement, even for [noncitizens] already ordered removed, [is not] conceptually different from the liberty interests of citizens considered in *Jackson*, *Salerno*, *Foucha*, and *Hendricks*." *Velasco Lopez v. Decker*, 978 F.3d 842, 856 (2d Cir. 2020) (quoting *Demore.* 538 U.S. at 553 (Souter, J., concurring in part and dissenting in part)).

60. The Supreme Court recently had the opportunity to review the mandatory detention scheme pursuant to § 1226(c). *See generally Jennings*, 138 S. Ct. at 830. Although *Jennings* interpreted and clarified the "shall detain" clause of § 1226(c), it expressly declined to reach the merits of the due process claim at issue here. *Id.* at 851.

### B.  Reasonableness of Continued Detention Requires Judicial Scrutiny

61. While the Supreme Court upheld the constitutionality of the mandatory detention under § 1226(c) in *Demore*, it did so based on the petitioner's concession of deportability and the Court's flawed understanding that detention under § 1226(c) is typically "brief" and lasts a "very limited time." *Demore*, 538 U.S. at 513, 529 & n.12.  The Court cited government-provided data that purported to show that "in the majority of cases [detention under § 1226(c)] lasts for less than the 90 days we considered presumptively valid in *Zadvydas*," and that "in the minority of cases in which the [noncitizen] chooses to appeal," detention lasts "about five months." *Id.* at 529–30. However, those statistics were inaccurate even when the Supreme Court decided *Demore*.[4]

62. Even still, once detention extends beyond the limited timeframe authorized by *Demore*, immigrants must be afforded some procedural protections. *See Demore*, 538 U.S. at 532 (Kennedy, J., concurring) ("individualized determinations as to [] risk of flight and dangerousness" may be warranted "if the continued detention became unreasonable or unjustified"); *Hutto v. Finney*, 437 U.S. 678, 685–86 (1978) ("the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards");

---

[4] The Solicitor General in 2016 revealed that the statistical information provided by the government and relied upon by the Supreme Court in *Demore* was inaccurate, and the true average length of immigration detention was shown to be much longer. *See Jennings*, 138 S. Ct. at 869 (Breyer, J., dissenting) ("The Government now tells us that the statistics it gave to the Court in *Demore* were wrong. Detention normally lasts twice as long as the Government then said it did . . . thousands of people here are held for considerably longer than six months without an opportunity to seek bail.").

*Jackson v. Indiana*, 406 U.S. 715, 738 (1972) (detention beyond a "reasonable period of time" requires additional process or release); *McNeil v. Dir.*, *Patuxent Inst.*, 407 U.S. 245, 249–50 (1972) ("lesser safeguards may be appropriate" only if "duration of the confinement [is] strictly limited").

63. Following *Zadvydas* and *Demore*, every federal circuit court to consider the issue of an immigrant's prolonged detention found that Fifth Amendment due process imposes a temporal limitation on mandatory detention—either pursuant to the Due Process Clause itself or to avoid serious constitutional concerns. *German Santos v. Warden Pike Cty. Corr. Fac.*, 965 F.3d 203, 209 (3d Cir. 2020) (holding that at a certain point, "due process requires the Government to justify continued detention at a bond hearing" for a petitioner detained under § 1226(c)) (internal citations and quotations omitted) (citing *Chavez-Alvarez v. Warden*, 783 F.3d 469, 478 (3d Cir. 2015); *Rodriguez v. Marin*, 909 F.3d 252, 256 (9th Cir. 2018) (expressing "grave doubts that any statute that allows for arbitrary prolonged detention without any process is constitutional or that those who founded our democracy precisely to protect against the government's deprivation of liberty would have thought so"); *Sopo v. U.S. Atty. Gen.*, 825 F.3d 1199, 1214 (11th Cir. 2016) *vacated* 890 F.3d 952 (11th Cir. 2018) ("[A]s a matter of constitutional avoidance . . . [w]e too construe § 1226(c) to contain an implicit temporal limitation at which point the government must provide an individualized bond hearing to detained criminal [noncitizens] whose removal proceedings have become unreasonably prolonged"); *Lora v. Shanahan*, 804 F.3d 601, 606 (2d Cir. 2015) *cert. granted, judgment vacated,* 84 USLW 35562 (U.S. Mar. 5, 2018) (setting bright-line six-month limitation on mandatory detention); *Rodriguez v. Robbins*, 804 F.3d 1060, 1138 (9th Cir. 2015) *rev'd sub nom. Jennings*, 138 S. Ct. at 830; *Diouf v. Holder*,

634 F.3d 1081 (9th Cir. 2011); *Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003). These decisions are consistent with the maxim that the "Due Process Clause foresees eligibility for bail as part of due process" because "[b]ail is basic to our system of law. *Jennings*, 138 S. Ct. at 862 (Breyer, J., dissenting) (internal quotations and citations omitted).

64. Courts have held that the Constitution requires scrutiny of an individual's detention when their detention becomes prolonged. *See Zadvydas*, 533 U.S. at 701 ("Congress previously doubted the constitutionality of detention for more than six months"); *Demore*, 538 U.S. at 529–30; *Cheff v. Schnackenberg*, 384 U.S. 373, 380 (1966) (plurality opinion) (limiting imposable sentence to six months for a criminal offense without procedural protection of a jury trial); *McNeil*, 407 U.S. at 249, 250–52 (recognizing six months as outer limit for confinement without individualized inquiry for civil commitment); *Velasco Lopez*, 978 F.3d at 855 n. 13 (acknowledging that the Supreme Court in *Zadvydas* "held that . . . a presumptively constitutional period of detention does not exceed six months"); *Lora*, 804 F.3d at 616 (requiring bail hearings "within six months" of detention); *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG DTBX, 2013 WL 3674492, at *20 (C.D. Cal. Apr. 23, 2013) (affording individualized bond hearings after 180-days of detention to class members, defined as all immigrants with serious mental disabilities detained in California, Arizona, and Washington, even when the mandatory detention statute under 8 U.S.C. § 1226(c) would otherwise apply).

65. When examining whether the length of detention is unconstitutionally prolonged, courts have adopted an individualized reasonableness test, reviewing factors such as if detention is reasonably related to the statute's purpose, the existence of government-caused delay, and the use of dilatory tactics by a noncitizen as opposed to good-faith challenges to

removal. *E.g.*, *Singh v. Garland*, No. 21-CV-00715 (CMA), 2021 WL 2290712, at *4 (D. Colo. June 4, 2021); *Villaescusa-Rios v. Choate*, No. 20-CV-03187 (CMA), 2021 WL 269766, at *3 (D. Colo. Jan. 27, 2021); *Singh v. Choate*, No. 19-CV-00909 (KLM), 2019 WL 3943960, at *5 (D. Colo. Aug. 21, 2019); *Banda v. McAlleenan*, 385 F. Supp. 3d 1099, 1106 (W.D. Wash. 2019); *Jamal v. Whitaker*, 358 F. Supp. 3d 853, 858059 (D. Minn. 2019); *Joseph v. Decker*, No. 18-CV-2640 (RA), 2018 WL 6075067, at *10–11 (S.D.N.Y. Nov. 21, 2018) (collecting cases from the Southern District of New York); *Fatule-Roque v. Lowe*, No. 17-1981, 2018 WL 3584696, at *5 (M.D. Penn. July 26, 2018) (collecting cases from the Middle District of Pennsylvania).

66. Most courts applying this reasonableness inquiry analyze five to six factors to determine whether continued detention is constitutional; those factors include:

(1) the total length of detention to date;
(2) the likely duration of future detention;
(3) the conditions of confinement;
(4) delays in the removal proceedings caused by the person in immigration custody;
(5) delays in the removal proceedings caused by the government; and
(6) the likelihood that removal proceedings will result in a final order of removal.

*Singh*, 2021 WL 2290172, at *4; *Villaescusa-Rios*, 2021 WL 269766, at *3; *Singh*, 2019 WL 3943960, at *5; *Ly*, 351 F.3d at 273; *Diop v. ICE/Homeland Sec*., 656 F.3d 221, 231–32 (3d Cir. 2011); *Chavez-Alvarez*, 783 F.3d at 476; *Sopo*, 825 F.3d at 1217; *Reid*, 819 F.3d at 499–500; *Joseph*, 2018 WL 6075067, at *10 (collecting cases from the Southern District of New York applying a similar five-factor test).

C. Due Process Requires a Bond Hearing with the Imposition of a Heightened Standard of Proof on the Government, and Consideration of Alternatives to Detention and Ability to Pay

67. Once a noncitizen's detention is deemed unreasonably prolonged and therefore unconstitutional without neutral review, the subsequent court ordered bond hearing must

include safeguards and meet certain standards for it to provide meaningful due process. Specifically, DHS must demonstrate by clear and convincing evidence that an individual presents an unjustifiable risk of flight or danger to the community to continue detention beyond six-months. *Velasco Lopez*, 978 F.3d at 855–56 (finding that DHS must bear the burden by clear and convincing evidence at immigration bond hearings, noting that "shifting the burden of proof to the Government to justify continued detention promotes the Government's interest—one we believe to be paramount—in minimizing the enormous impact of incarceration in cases where it serves no purpose"); *Rodriguez*, 804 F.3d at 1087; *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011) (placing the burden on DHS by a clear and convincing evidence); *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 951 (9th Cir. 2008); *Singh*, 2019 WL 3943960, at *7 (same); *Franco-Gonzalez*, CV-10-02211, 2013 WL 3674492 at *13 (C.D. Cal. Apr. 23, 2013) (requiring bond hearings after 180 days of detention for class members with mental disabilities where DHS must demonstrate continued detention is warranted by clear and convincing evidence).

68. The Supreme Court held that the burden to determine the legality of preventative detention should be squarely on the government as it is improper to ask an individual to "share equally with society the risk of error" where the individual's liberty interest is of "such weight and gravity." *Addington*, 441 U.S. at 427. The individual's liberty interest is strong even at the moment of detention, *Velasco Lopez*, 978 F.3d at 851, and even though "the Government's interests *may* [] initially outweigh short-term deprivation of [a noncitizen's] liberty interests, *that balance shifts* once [] imprisonment [becomes] unduly prolonged," *id*. at 855 (emphasis added). At that point, "the Government [must] justify its continuation." *Id*. Therefore, given the gravity of deprivation when the government preventively detains

individuals, due process requires the jailers to establish the necessity of detention. *E.g.*, *Salerno*, 481 U.S. at 751 (affirming legality of pre-trial detention where the burden of proof is on the government); *Foucha*, 504 U.S. at 81–82, 86 (holding unconstitutional a state civil insanity detention "statute that place[d] the burden on the [person in detention] to prove that he is not dangerous").

69. Further, due process requires that an IJ consider an individual's ability to pay a bond and alternative conditions of release when setting a bond. *Salerno*, 481 U.S. at 754 ("bail must be set by a court at a sum designed to [prevent flight] and no more") (citation omitted); *Hernandez, et.al. v. Garland et.al.*, No. EDCV 16-620 JGB (KKx), 2022 WL 1176752 (C.D. Cal. Mar. 28, 2022) (settlement agreement delineating that DHS must consider financial circumstances and ability to pay bond); *Hernandez v. Sessions*, 872 F.3d 976, 991 & n.4 (9th Cir. 2017) ("a bond determination that does not include consideration of financial circumstances and alternative release conditions is unlikely to result in a bond amount that is reasonably related to the government's legitimate interests"). Moreover, the Colorado legislature is committed to bail reform and in 2013, the General Assembly passed House Bill 13-1236. *See* 1 Colo. Sess. Laws 2013, ch. 202, pp. 820 et seq.; §§ 16-1-104, C.R.S. et seq. To prevent pretrial detention, the statute changed the definition of bail, allowing for monetary bail only when necessary, creating a presumption of release, and requiring courts to consider the individual circumstances presented in each case. Although wholly persuasive, this framework should similarly be adopted when assessing whether persons in DHS custody have the financial means to secure their liberty on balance with any factors indicating dangerousness or flight risk.

    D.        <u>Fifth Amendment Due Process Protects Against Prolonged Detention and Respondents are Violating Mr. Sheikh's Constitutional Rights</u>

70. Mr. Sheikh's mandatory detention is unconstitutional because it is insufficiently related to the purpose of detention recognized in *Demore*; *i.e.*, (1) to ensure the appearance of noncitizens at future hearings; and (2) to prevent danger to the community pending completion of removal. *Demore*, 538 U.S. at 532–33 (Kennedy, J., concurring). Pivotal to the first rationale for detention, Mr. Sheikh does not have any future hearings and he successfully filed, through court-appointed counsel, an appeal that is currently pending before the BIA. Perhaps most compelling here is the fact that regardless of the outcome of Mr. Sheikh's appeal regarding his LPR status, the IJ granted relief from removal. Both DHS and EOIR agree that it is more likely than not Mr. Sheikh will face torture in Somalia, and he *cannot* be deported there. Thus, he remains detained solely awaiting a final decision on *which* immigration status he retains, not whether he will ultimately face deportation. Accordingly, implementation of the six-factor test and the plain meaning of "deportable" in § 1226(c) requires Mr. Sheikh's release; his continued detention without an individualized custody assessment is unconstitutional. Each factor weighs heavily in his favor.

71. *First*, Mr. Sheikh has already been detained for 366 days. Moreover, Mr. Sheikh, an LPR in the United States, waited in DHS custody for 266 days before an IJ meaningfully evaluated the charges brought against him by DHS. "[C]ourts have found detention for approximately a year or more constitutionally unreasonable." *Singh*, 2019 WL 3943960, at *5 (detention for over twenty months strongly favors granting a bond hearing); *Salazar v. Rodriguez*, No. CV 17-1099 (JMV), 2017 WL 3718380, at *6 (D.N.J. Aug. 29, 2017) (finding detention for just over one year unreasonable); *Lett v. Decker*, 346 F. Supp. 3d 379, 387 (S.D.N.Y. 2018) (finding detention unreasonable where noncitizen detained for

nearly ten months); *Perez v. Decker*, No. 18-CV-5279, 2018 WL 3991497, at *6 (S.D.N.Y. Aug. 20, 2018) (holding that a detention under § 1225(b)(2)(A) longer than nine months was "unreasonable" and that the noncitizen's due process rights "require[d] him to be afforded...an individualized bond hearing")). Thus, the preliminary factor weighs strongly in Petitioner's favor based on the length of his detention. *Id.*

72. *Second*, Mr. Sheikh will likely remain detained indefinitely because DHS continues to imprison him as he exercises his right to appellate review and Respondents are unable to demonstrate the likely duration of future detention, though it will likely be protracted. Should the BIA find in favor of Mr. Sheikh, it is possible his case could be remanded to the immigration court. If the BIA order is final and finds that the IJ committed no legal error, Mr. Sheikh intends to appeal his case to the Tenth Circuit Court of Appeals. Meanwhile, DHS cannot deport Mr. Sheikh to Somalia given it stipulated to his fear-based claim and the IJ agreed, determining it more likely than not he would face torture. Thus, Mr. Sheikh remains detained in immigration custody despite the fact that one of the two constitutionally permissible grounds for detention—risk of absconding if ordered removed—is inapplicable to his case. *E.g.*, *Demore*, 538 U.S. at 515, 527–28. The current backlog of immigration cases suggests that Mr. Sheikh's immigration matters will not be resolved in "due course." *Singh*, 2019 WL 3943960, at *6 (citing *E. Bay Sanctuary Covenant v. Trump*, No. 18-17274, 2018 WL 8807133 (9th Cir. Dec. 7, 2018). On balance, the second factor tips heavily in Mr. Sheikh's favor.

73. *Third*, Mr. Sheikh is detained by DHS at the Aurora facility and the evidence overwhelmingly establishes poor conditions of confinement, akin to punitive settings, which are further exacerbated by Mr. Sheikh's mental health diagnoses. Respondents are

on notice of the inadequate medical and mental health care available at the Aurora Contract Detention Facility yet fail to mitigate the enumerated violations of DHS's own detention standards.[5] In a June 2019 investigation conducted by the DHS Office of Inspector General the Aurora facility was found in violation of ICE detention standards.[6] The OIG report found that individuals subjected to segregation in Aurora "were not treated with the care required under ICE detention standards" and determined that the absence of outside recreation may reduce the mental health and welfare of people held in the Aurora facility. *Id.*

74. Further, Mr. Sheikh has a known disability that exacerbates the conditions of his confinement. Although Mr. Sheikh is detained under civil law statutes, the conditions inside the Aurora facility resemble a prison, and as a result, must be a factor that tips the scales heavily toward finding his continued detention prolonged and unconstitutional. *See King v. Cty. of Los Angeles*, 885 F.3d 548, 556–57 (9th Cir. 2018) (finding that due process requires that conditions in civil detention facilities may not be the same as or worse than those in a prison). Mr. Sheikh's known disabilities are not properly accommodated in

---

[5] *See* AIC 2022 Complaint, "Re: Violations of ICE COVID-19 Guidance, PBNDS 2011, and Rehabilitation Act of 1973 at the Denver Contract Detention Facility, (Feb. 11, 2022) *available at*: https://www.americanimmigrationcouncil.org/sites/default/files/research/complaint_against          _ice _medical_neglect_people_sick_covid_19_colorado_facility_complaint1.pdf; AIC/AILA 2019 Complaint, "Supplement—Failure to Provide Adequate Medical and Mental Health Care to Individuals Detained in the Denver Contract Detention Facility," (Jun. 11, 2019) *available at*: https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/complaint_supplement _failure_to_provide_adequate_medical_and_mental_health_care.pdf; AIC/AILA 2018 Complaint, "Failure to Provide Adequate Medical and Mental Health Care to Individuals Detained in the Denver Contract Detention Facility,"[5] (Jun. 4, 2018) *available at*: http://www.americanimmigrationcouncil.org/sites/default/files/ general_litigation/complaint_demands_investigation_into_inadequate_medical_and_mental_health_care_ condition_in_immigration_detention_center.pdf.
[6] OIG Report, Acting Inspector General John V. Kelly, "Concerns about ICE [] Treatment [of Detained Persons] and Care at Four Detention Facilities," (Jun. 3, 2019) *available at*: https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf.

confinement and his continued imprisonment is causing a rapid deterioration of his health. Ex. L at 60–66, ¶¶ 15–30. Thus, the subjective evidence further supports Mr. Sheikh's claim. Perhaps most importantly, as stated by this Court in *Singh*, Mr. Sheikh "is being deprived of his liberty—thus, this factor seems somewhat beside the point" and weighs in his favor. *Singh*, 2019 WL 3943960, at *6.

75. *Fourth*, Mr. Sheikh has not engaged in any dilatory tactics and prevailed in his defense against removal. The IJ's order granting Mr. Sheikh protection pursuant to the implementing regulations of the Convention Against Torture is final. He remains detained because he is exercising his appellate right and challenges the IJ's finding that he no longer qualifies for LPR status. Therefore, this factor weighs heavily in his favor.

76. *Fifth*, in contrast, Respondents failed to present Mr. Sheikh before an IJ and give him notice of the charges against him until 37 days after DHS incarcerated him. Further, although DHS bore the burden of proof in establishing Mr. Sheikh's removability by clear and convincing evidence, it was only when the IJ indicated she intended to terminate Mr. Sheikh's removal proceedings when DHS produced evidence in support of its litigation position. Namely, it waited 212 days from the date it initiated removal proceedings to file documentation in an attempt to meet its burden, prolonging Mr. Sheikh detention. It was not until the 266th day of his incarceration until the IJ ruled on the charges DHS lodged against Mr. Sheikh.

77. Additionally, although the NQRP nationwide policy provides essential safeguards for individuals deemed mentally incompetent to represent themselves in removal proceedings, those procedural protections undoubtedly create significant delays in the processing of removal proceedings of anyone identified as demonstrating indicia of incompetency. The

policy requires IJs to conduct JCIs once the issue of competency is raised – which causes the court to pause all proceedings related to the underlying immigration case and conduct one or more hearings to determine whether people are competent to represent themselves in their removal proceedings. Ex. A. DHS is obligated to provide the immigration court with relevant information in its possession, such as medical documents, used to inform the court when a respondent's mental competency is at issue and delays may occur as records are compiled. *See Matter of M-A-M-*, 25 I. & N. Dec. at 480. As Mr. Sheikh waited in custody, on July 26, 2021, DHS filed a Motion for Consideration of Health Records. On August 6, 2021, Mr. Sheikh appeared before the IJ, who then ordered a competency evaluation. While that was pending, Mr. Sheikh's case was twice more scheduled and reset by the court. On September 8, 2021, the IJ held a hearing and ordered the provision of a qualified representative to counsel Mr. Sheikh in his removal proceedings, pursuant to the NQRP nationwide policy. Thus, the total length of detention is longer in Mr. Sheikh's case because he was subject to a JCI.

78. *Sixth*, Mr. Sheikh prevailed in his claim for protection under the implementing regulations of the Convention Against Torture and, even if he does not prevail in his appeal of the immigration court's determination regarding his LPR status, his deportation is nevertheless deferred because it is more likely than not that he will be tortured in Somalia, and this factor strongly favors Mr. Sheikh. *See e.g., Nadarajah v. Gonzales*, 443 F.3d 1069, 1071 (9th Cir. 2006) (granting a writ of habeas corpus where Petitioner *"*prevailed at every administrative level of review and who has never been charged with any crime."). Thus, Mr. Sheikh is the prevailing party in his underlying immigration case and poses no risk of flight and his continued detention is not reasonably related to its purpose. *See Bell v.*

*Wolfish*, 441 U.S. 520, 538 (1979) (providing a framework for determining whether confinement constitutes punishment by first inquiring whether the intent to punish exists and if not, whether there was a reasonable government purpose for the restraint as well as if it was excessive). Due process requires an individualized analysis of dangerousness and flight, and if this Court declines to order Mr. Sheikh's release, at a minimum DHS must prove by clear and convincing evidence that Mr. Sheikh should remain detained at a bond hearing held within seven days of this Court's decision.

## II.    The Conditions of Mr. Sheikh's Confinement Constitute Impermissible Punishment That Creates an Objectively Unreasonable Harm

79. In addition to liberty interests the Due Process Clause protects against *any* punishment as it relates to pretrial detention. *See Bell*, 441 U.S. at 535 ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). The conditions of confinement in this case –its length, its unrelatedness to the statute's purpose, and the impact imprisonment has on Mr. Sheikh's mental health – create an objectively unreasonable harm that rises to the level of punishment. The government's objectives of detaining Mr. Sheikh are not reasonable because they could be equally met by less punitive alternatives and are not connected to a constitutionally permitted purpose: to avoid flight or dangerousness. Therefore, Mr. Sheikh respectfully requests release.

80. The Supreme Court has found that punishment may be inferred "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless." *Id.* at 539. *Bell* was the first case that drew a distinct line between the standard that applies in due process claims brought by people held in pre-trial detention versus people imprisoned post-conviction. *Id.* It provides a framework for determining whether confinement constitutes

punishment by (1) inquiring whether the intent to punish exists; (2) if not, whether there was a reasonable government purpose for the restraint and if it was excessive; and (3) whether less punitive alternatives are available. *Id.* at 538–39 n.20.

81. Individuals held in civil detention are "entitled to protections at least as great as those afforded to a civilly committed individual." *Bell*, 441 U.S. at 536. When someone is civilly detained, the government must demonstrate that the underlying purpose is related to "legitimate" and "non-punitive" justifications. *Bell*, 441 U.S. at 539; *see also King*, 885 F.3d at 558 (civil detention becomes punitive when its conditions are the same as in the criminal setting). Even if government interests are nonpunitive, they can nevertheless be excessive, particularly if a viable alternative exists. *Bell*, 441 U.S. at 539 n.20.

82. In *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the Supreme Court made clear that the Due Process Clause protects against a substantial risk of serious harm in cases involving pretrial detention. *Id.* at 2473. In this context, an objective deliberate indifference standard applies, requiring plaintiffs to demonstrate that a custodian should have known of the person's serious medical needs or that a substantial risk of serious harm existed and failed to take reasonable measures to address the risk, rather than the much higher requirement of actual knowledge. *Id.* at 2476. In light of *Kingsley*, an objective standard of fault also governs non-use-of-force conditions claims, although the Tenth Circuit has yet to squarely address whether to adopt that standard. *See Miranda v. Cty. of Lake*, 900 F.3d 335, 350 (7th Cir. 2018); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018), cert. denied, 139 S. Ct. 794 (2019); *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2d Cir. 2017); *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070–71 (9th Cir. 2016) (en banc), cert. denied, 137 S. Ct. 831 (2017); *see also Partridge v. Pelle*, No. 17-CV-02941-CMA-STV,

2019 WL 1045840, at *6 (D. Colo. Mar. 5, 2019) (declining to "analyze Kingsley's impact on a Fourteenth Amendment deliberate indifference claim."); *Perry v. Durborow*, 892 F.3d 1116, 1122 n.1 (10th Cir. 2018) ("We haven't yet addressed Kingsley's impact on Fourteenth Amendment claims like this one."); *see also Estate of Vallina v. Cty. of Teller Sheriff's Office*, 757 F. App'x 643, 646–47 (10th Cir. Dec. 4, 2018) (noting circuit split regarding whether *Kingsley* extends to pretrial medical care for people in detention and conditions of confinement claims without resolving the question).

83. Looking to cases applying the *Kingsley* standard, prison officials demonstrate objective deliberate indifference when they disregard obvious risks of serious harm. *Castro*, 833 F.3d at 1071 ("[T]he test to be applied under *Kingsley* must require a pretrial [detained person] who asserts a due process claim for failure to protect to prove more than negligence but less than subjective intent—something akin to reckless disregard."). Mere negligence by a prison official does not incur liability. *See Darnell*, 849 F.3d at 36 (rejecting argument that objective deliberate indifference standard would find officials liable for acting negligently); *Castro*, 833 F.3d at 1071. However, when danger is both serious and obvious and a custodian fails to act, that person may be liable even if there is no subjective appreciation of the danger. *Castro*, 833 F.3d at 1071 ("[A] pretrial [detained person] need not prove those subjective elements about the officer's actual awareness of the level of risk.").

84. *First*, there are at least three separate grounds that establish Mr. Sheikh continued confinement constitutes punishment in violation of his due process rights. As an initial matter, Mr. Sheikh incarceration has lasted 366 days, an amount of time that presumably constitutes punishment and is excessive in relation to its objective. *See e.g. United States*

*v. Melendez-Carrion*, 790 F.2d 984, 1001 (2d Cir. 1986) ("The Due Process Clause reflects the constitutional imperative that incarceration to protect society from criminals may be accomplished only as punishment of those convicted for past crimes and not as regulation of those feared likely to commit future crimes."). Further, the conditions of Mr. Sheikh's civil confinement are the same (if not worse) than in a criminal setting. Ex. L; *see King*, 885 F.3d at 558. Finally, Mr. Sheikh has a known disability that renders his confinement more punitive to him than people who do not experience a disability given the manners in which his mental illness responds to his incarceration, creating a punitive environment. Namely, his uncontrolled Depression and Anxiety are causing Mr. Sheikh to want to relinquish his appellate rights solely because of the strain his detention causes on his daily functioning. Ex. L at 61, ¶ 19. Respondents are exhibiting reckless disregard for the ongoing harm, as well as the heightened risks he faces in confinement, both of which relate to his disability. *See e.g. Kingsley*, 135 S. Ct. at 2477.

85. *Second*, even if the Court does not find the conditions of Mr. Sheikh's incarceration constitutes punishment, Mr. Sheikh's continued incarceration is not linked to a legitimate government goal and is arbitrary and purposeless. *See Bell*, 441 U.S. at 539. When considering whether detention is warranted in immigration matters involving civil detention, courts consider flight risk and dangerousness. 8 U.S.C. § 1226(c)(2); *Zadvydas*, 533 U.S. at 690. Here, Mr. Sheikh is not a flight risk because he cannot be deported to Somalia and was granted relief from removal that is not at issue on appeal. Moreover, he is challenging the IJ's decision on removability before the BIA and has a significant interest in engaging in further litigation given his LPR status is at stake. Mr. Sheikh is not a danger because (a) his incarceration led to Mr. Sheikh being medicated and he has a profound

appreciation for the tremendous reduction of symptoms related to his mental disability, including hallucinations and delusions, that contributed to his prior criminalization; and (b) Mr. Sheikh is dedicated to seeking robust treatment – more attuned to his needs than what is available in DHS custody – upon release. Thus, the government cannot justify Mr. Sheikh's continued detention or should at least be ordered to try to do so within seven days of this Court's order.

86. *Third*, a viable alternative to detention exists that is less punitive. *Bell*, 441 U.S. at 539 n.20. The vast majority (approximately 98 percent) of people whose immigration cases are pending in the U.S. judicial system are not detained. *See* Congressional Research Service, "Immigration: Alternatives to Detention (ATD) Programs," (July 8, 2019), *available at*: https://fas.org/sgp/crs/homesec/R45804.pdf (hereinafter "ATD Programs"); *see also Hernandez*, 872 F.3d at 991. Accordingly, it is reasonable for Mr. Sheikh to request release from imprisonment as a viable alternative to remedy the due process violations presented. *Cf. also Brown v. Plata,* 563 U.S. 493 (2011) (ordering the release of people imprisoned in California with mental health conditions suffering from overcrowding and substandard treatment as a remedy for Eighth and Fourteenth Amendment violations); *Gordon v. County of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018). As stated in *Bell*, "[b]ecause the Due Process clause prohibits any punishment, cruel and unusual or otherwise, a violation of the Eighth Amendment is necessarily a violation of the Due Process clause." *Bell,* 441 U.S. at 545.

87. In sum, the U.S. Constitution does not allow for a noncitizen's liberty to be indefinitely stricken without affording adequate due process nor does it allow for punitive confinement

in the context of civil detention. Mr. Sheikh calls upon this Court to remedy the Fifth Amendment violations committed by Respondents. Thus, release is warranted.

### III.   Mr. Sheikh's Continued Imprisonment without an Individualized Analysis of Flight Risk and Dangerousness in Which DHS Bears the Burden of Proof is in Violation of the Administrative Procedures Act

88. EOIR and DHS violated the APA in failing to abide by the NQRP nationwide policy directives. Mr. Sheikh challenges the agency actions that are arbitrary, capricious, and contrary to law. 5 U.S.C. § 706; *see also Accardi v. Shaughnessy*, 347 U.S. 260 (1954) (agencies must follow their own internal regulations and policies); *Yellin v. United States*, 374 U.S. 109, 121 (1963) (recognizing that even if the petitioner does not ultimately prevail, he "should at least have the chance given him by the regulations.").

89. Congress supplied framework for review of APA claims in 5 U.S.C. § 706, directing courts to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706(1). Reviewing courts have the authority to compel agency action unlawfully withheld but shall also "hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2).

90. In *Accardi*, the Supreme Court vacated a deportation order that violated the "[r]egulations [that] prescribe[d] the procedure to be followed in processing [a noncitizen's] application for suspension of deportation." 347 U.S. at 265. The Court explained that "as long as the regulations remain operative, the Attorney General denies himself the right to sidestep BIA or dictate its decision in any manner." *Id.* at 267. Thus, *Accardi* is the bedrock for the

proposition that federal agencies are required to follow their own procedures. *Morton v. Ruiz*, 415 U.S. 199, 233–35 (1974) ("[W]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."); *United States v. Heffner*, 420 F.2d 809 (4th Cir. 1969) (courts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself). Under the APA, "agency action must be based on non-arbitrary, 'relevant factors.'" *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)). The Tenth Circuit has found that the *Accardi* holding applies to rules and policies created to protect the rights of those regulated by the agency. *See Rosenberg v. Comm'r,* 450 F.2d 529, 532 (10th Cir. 1971); *United States v. Lockyer,* 448 F.2d 417, 420–21 (10th Cir. 1971).

91. The APA applies in the immigration context and affords judicial review when there is no other adequate remedy in the courts after final agency action. *See* 5 U.S.C. § 704; *Damus v. Nielsen*, 313 F. Supp. 3d 317, 341 (D.D.C. 2018) (finding plaintiffs demonstrated a likelihood of success on the merits of their *Accardi* claim arguing that DHS was not abiding by their own policies and procedures when adjudicating parole requests submitted by asylum seekers); *Inland Empire - Immigrant Youth Collective v. Nielsen*, No. 5:17-cv-02048-PSG-SHK, 2018 WL 4998230, at *16 (C.D. Cal. Apr. 19, 2018) (finding that plaintiffs stated a viable APA claim when DHS automatically revoked Deferred Action for Childhood Arrivals ("DACA") status though the service of a charging document, the Notice to Appear ("NTA"), which was not an enumerated basis for termination in the controlling regulations and memoranda); *Torres v. U.S. Dep't of Homeland Sec.*, No.

17CV1840 JM(NLS), 2017 WL 4340385, at *6 (S.D. Cal. Sept. 29, 2017) (making clear that a federal agency must follow its own procedures).

92. In *Torres*, plaintiff sued under the APA, bringing a procedural challenge to DHS's termination of his status under the DACA policy. In that case, plaintiff was granted DACA status in 2013 pursuant to a 2012 program that provided temporary protection from deportation for eligible individuals. *Id.* at 1. One year later, in 2014, DHS renewed his application for continued DACA status. *Id.* at 2. In 2016, DHS detained plaintiff and subsequently terminated his DACA status without following the procedures set forth in the policy guidance. *Id.* The court granted a preliminary injunction, finding that although DHS had broad prosecutorial discretion authority, plaintiff made a "strong showing that he is likely to prevail on his APA claim that defendants acted arbitrarily, capriciously, and abused their discretion by failing to follow the DACA Standard Operating Procedure in its denial process." *Id.* at 6. Thus, an agency's violation of its own policy guidance constitutes "unlawful" action under the APA. *Id.* (quoting 5 U.S.C. § 706(2)).

93. Subsequently, in *Damus* a class of asylum seekers filed an APA claim against DHS alleging it failed to adhere to its own policy that requires an individualized determination when someone who received a positive fear finding from the Asylum Office submits a parole request seeking release from immigration custody. 313 F. Supp. 3d at 336–37. DHS argued plaintiffs could not rely on the agency's parole directive because it was not "binding" on the agency. *Id.* at 337. However, the court found DHS's argument flawed and instead determined that "the policies and procedures contained within the Directive establish a set of minimum protections for those seeking asylum, including an opportunity to submit documentation, the availability of an individualized parole interview, and an explanation

of the reasons for a parole denial. The Directive therefore falls squarely within the ambit of those agency actions to which the doctrine may attach." *Damus*, 313 F. Supp. 3d at 337 (citing *Pacific Molasses Co. v. FTC*, 356 F.2d 386, 389–90 (5th Cir. 1966) ("[O]nce an agency exercises its discretion and creates the procedural rules under which it desires to have its actions judged, it denies itself the right to violate these rules."); *Pasquini v. Morris*, 700 F.2d 658, 663 n.1 (11th Cir. 1983) ("Although the [INS] internal operating instruction confers no substantive rights on the [noncitizen] applicant, it does confer the procedural right to be considered for such status upon application.")).

94. The factors considered by the courts in *Torres* and *Damus* are informative and provide a framework for analyzing the present APA claim set forth by Mr. Sheikh. In 2013 both EOIR and DHS published final policy memorandum that created the NQRP nationwide policy. Both memoranda provide guidance allowing for a bond hearing after six months of detention for people covered by the NQRP nationwide policy. Ex. A at 2 ("…detained [noncitizens] who were initially identified as having serious mental disorder or condition that may render them incompetent to represent themselves and who have been held in detention by DHS for six months or longer will be afforded a bond hearing."); Ex. C at 6 ("EOIR's new policy also provides custody hearings to unrepresented detained [noncitizens] who were identified as having a serious mental disorder or condition that may render them incompetent to represent themselves and have been detained in ICE custody for six months or longer."). Further, EOIR created a checklist[7] for immigration judges considering NQRP cases and specifically created a section for the "Nationwide Policy

---

[7] Of note, in the IJ Competency Evaluation Checklist there is no indication that people covered by the NQRP nationwide policy are ineligible for an individualized bond hearing if they are otherwise subject to mandatory detention. *See* Ex. E.

Bond Hearing," directing judges to conduct a bond hearing between 180 and 195 days of detention if the person is identified before the 180th day, otherwise "as soon as practicable." Ex. E at 29.

95. Mr. Sheikh alleges that EOIR and DHS are applying the NQRP nationwide policy in an arbitrary and capricious manner and are effectively failing to follow agency policy guidance. Namely, he was not afforded an individualized bond hearing conducted by a neutral arbiter after six months of detention. Rather, when he sought a bond hearing after eleven months of detention the IJ declined to assume jurisdiction, in violation of the NQRP Nationwide Policy.

96. Given the NQRP Nationwide Policy promulgated by EOIR and adopted by DHS is meant to protect the rights of persons with serious mental disabilities in immigration proceedings, the *Accardi* doctrine attaches. *Accardi*, 347 U.S. at 268 (holding that agencies can be held to account if they do not adhere to their own codification of procedures and policies – particularly those that impact individual rights). Because EOIR and DHS are not following their own policy outside of the jurisdiction of the Ninth Circuit where the permanent injunction in *Franco-Gonzalez,* 2013 WL 3674492, at *20, is binding, their action is arbitrary, capricious, and contrary to law. *See* 5 U.S.C. §§ 702, 706(2); *Damus*, 313 F. Supp. 3d at 341.

97. The Rocky Mountain Immigrant Advocacy Network ("RMIAN") has provided legal representation to countless clients under the NQRP nationwide policy since 2015 and EOIR has inconsistently applied the bond hearing provision of the policy. First, after appointing a QR through the NQRP nationwide policy, on January 25, 2017, the Aurora Immigration Court unilaterally issued a notice for a Custody Redetermination Hearing for an NQRP

client, scheduled for April 12, 2017 – a date approximately six months after the client's confinement in DHS custody. Ultimately, the IJ assumed jurisdiction, despite a finding of removability that implicated the mandatory detention statute, 8 U.S.C. § 1226(c), but declined to grant release due to a finding of dangerousness. In contrast, the Aurora Immigration Court held a bond hearing for a RMIAN client appointed counsel through the NQRP nationwide policy on February 6, 2019. The following day, the IJ issued an Order with Respect to Custody, finding it lacked jurisdiction and was without authority to redetermine the conditions of detention given its determination that the client was subject to mandatory detention pursuant to INA § 236(c); a finding the BIA later upheld. Ex. F at 31–32.

98. Thus, Mr. Sheikh's case follows agency practice of ignoring the NQRP nationwide policy's guidance affording a bond hearing after six months of detention outside of the Ninth Circuit and demonstrates the agency's failure to act. Mr. Sheikh demonstrates that neither EOIR nor DHS are consistently following the 2013 NQRP nationwide policy guidance, outlined above, when it comes to affording individualized bond hearings and not adhering to the policy that they promulgated, against public interest and in violation of the APA. 5 U.S.C. §§ 702, 706.

99. Given Mr. Sheikh's continued detention by Respondents is unlawful, the Court should order his release unless he is afforded the hearing required by the NQRP Nationwide Policy within a reasonable period, not to exceed seven days.

## CLAIMS FOR RELIEF

### COUNT ONE

**Application of Section 1226(c) to Mr. Sheikh is a Violation of the Due Process Clause of the Fifth Amendment**

100.      The Supreme Court has never authorized a reading of 8 U.S.C. § 1226(c) that would permit DHS to detain noncitizens without bond in cases where flight risk and danger cannot be reasonably presumed. *Demore*, 538 U.S. at 533 (Kennedy, J., concurring, "If the government cannot satisfy [the minimal threshold burden of showing the relationship between detention and its purpose] then the permissibility of continued detention pending deportation proceedings turns solely upon the [noncitizen's] ability to satisfy ordinary bond procedures . . . .").

101.      As applied to Mr. Sheikh, 8 U.S.C. § 1226(c) is unconstitutional because DHS has no interest in detaining him given the IJ granted relief from removal, a finding that DHS stipulated to and is not at issue on appeal. Nevertheless, he has been detained in ICE custody for almost a year; it is unclear how much longer DHS will hold him in custody; the Aurora facility has a longstanding record of providing inadequate medical care; he did not cause significant delay in his immigration proceedings; conversely, DHS delayed filing evidence in support of removability for 212 days while Mr. Sheikh remained confined; there is no mechanism by which Mr. Sheikh can be deported given an IJ found he merits protection against future torture in Somalia; and Mr. Sheikh has a substantial claim that he is not deportable at all.

102.      Mr. Sheikh's 366-day detention without a bond hearing before a neutral adjudicator is therefore unreasonable and violates Due Process.

## COUNT TWO

**The Due Process Clause of The Fifth Amendment Protects Against Impermissible Punishment that Creates an Objectively Unreasonable Harm**

103.    The Fifth Amendment to the U.S. Constitution does not allow for persons in pre-trial or civil detention to be subjected to imprisonment that rises to the level of punishment. Mr. Sheikh's detention is punitive based on its length, because it is akin to criminal incarceration, and given the symptoms of his disability are severely exacerbated due to his confinement Respondents lack legitimate, non-punitive justifications motivating Mr. Sheikh's continued confinement and a viable alternative to detention exists.

104.    For these reasons, Respondents' ongoing detention of Mr. Sheikh constitutes punishment and violates the Due Process Clause of the Fifth Amendment.

**COUNT THREE**

**Respondents' Failure to Provide a Bond Hearing after Six Months of Detention, as Required Under the National Qualified Representative Program, Violates the APA**

105.    Agencies must follow their own policies and procedures, particularly when they impact individual rights. *Accardi*, 347 U.S. at 268.

106.    EOIR and DHS' failure to adhere to a policy both agencies promulgated in formal memos is arbitrary, capricious, and contrary to law in violation of 5 U.S.C. § 706.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Sheikh prays that this Court grant the following relief:

1)  Assume jurisdiction over this matter;

2)  Enjoin Respondents from transferring Mr. Sheikh outside of the jurisdiction of the District of Colorado pending the resolution of this case;

3)  Issue a writ of habeas corpus directing Respondents to release Mr. Sheikh on his own recognizance or, in the alternative, provide Mr. Sheikh, within seven days of this Court's order, a constitutionally adequate, individualized bond hearing before an impartial adjudicator where: (1) DHS bears the burden of establishing by clear and convincing evidence that continued detention is justified; (2) the adjudicator is required to meaningfully consider alternatives to imprisonment such as community-based alternatives to detention including conditional release, parole, as well as Mr. Sheikh's ability to pay a

bond; and (3) the adjudicator may not give undue weight to allegations underlying dismissed or pending criminal charges.

4) Award Mr. Sheikh attorney's fees and costs under the Equal Access to Justice Act ("EAJA") as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any other basis justified under law; and

5) Grant any other and further relief that this Court deems just and proper.

Dated: June 30, 2022                                        Respectfully submitted,

                                                        s/ Laura P. Lunn
                                                *Director of Advocacy & Litigation*
                                                      Oregon Bar: 141480
                                                        (720) 370-9100
                                                      llunn@rmian.org

                                                        s/ Conor Gleason
                                          *Detention Program Senior Staff Attorney*
                                                    NY Registration: 5109962
                                                        (720) 370-9100
                                                    cgleason@rmian.org

                                    ROCKY MOUNTAIN IMMIGRANT ADVOCACY NETWORK
                                                  7301 Federal Boulevard, Suite 300
                                                  Westminster, Colorado 80030

                                                  *Pro Bono Counsel for Petitioner*

---

## VERIFICATION

I, /s/ Laura Lunn, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that, on information and belief, the factual statements in the foregoing Petition for Writ of Habeas Corpus are true and correct.

Dated: June 30, 2022

**INDEX OF EXHIBITS**

| Exhibit | | Pages |
|---|---|---|
| A | Dep't of Justice, Executive Office for Immigration Review: *Nationwide Policy to Provide Enhanced Procedural Protections to Unrepresented Detained [Noncitizens] with Serious Mental Disorders or Conditions* (Apr. 22, 2013) | 1–2 |
| B | Dep't of Justice, Executive Office for Immigration Review: *Department of Justice and the Department of Homeland Security Announce Safeguards for Unrepresented [Noncitizens] with Serious Mental Disorders or Conditions* (Apr. 22, 2013) | 3–4 |
| C | Dep't of Homeland Security, Immigration and Customs Enforcement: *Guidance for New Identification and Information-Sharing Procedures Related to Unrepresented Detainees with Serious Mental Disorders or Conditions* | 5–6 |
| D | Dep't of Justice, Executive Office for Immigration Review: *Phase I of Plan to Provide Enhanced Procedural Protections to Unrepresented Detained Respondents with Mental Disorders* | 7–27 |
| E | Dep't of Justice, Executive Office for Immigration Review: Nationwide Policy: *Immigration Judge Competency Review Checklist* | 28–29 |
| F | EOIR Board of Immigration Appeals decision (redacted), A -809 (07/11/2019) | 30–32 |
| G | EOIR Immigration Judge order granting Mr. Sheikh's application for protection under the Convention Against Torture | 33–35 |
| H | EOIR Immigration Judge order denying Mr. Sheikh's request for custody redetermination due to lack of jurisdiction | 36–37 |
| I | EOIR Immigration Judge order requiring the provision of a Qualified Representative in Mr. Sheikh's removal proceedings | 38 |
| J | ICE Enforcement and Removal Operations officer's denial of release request | 39 |
| K | Psychological Evaluation of Mr. Sheikh conducted by Dr. Kohrt | 40–54 |
| L | Declaration of Megan Hope, LMSW, Mr. Sheikh's social worker | 55–70 |

## <u>CERTIFICATE OF SERVICE</u>

I, Laura Lunn, hereby certify that on June 30, 2022, I filed the foregoing with the Clerk of Court using the CM/ECF system. I, Conor Gleason, hereby certify that I have mailed a hard copy of the document to the individuals identified below pursuant to Fed.R.Civ.P. 4 via certified mail on June 30, 2022.

        Kevin Traskos
        Chief, Civil Division
        U.S. Attorney's Office
        District of Colorado
        1801 California Street, Ste. 1600
        Denver, CO 80202

        Merrick Garland
        Attorney General of the United States
        U.S. Department of Justice
        950 Pennsylvania Avenue, NW
        Washington, D.C. 20530

And to: Alejandro Mayorkas; Tae Johnson, and Johnathan Meyer, DHS/ICE, c/o:

        Office of the General Counsel
        U.S. Department of Homeland Security
        Washington, D.C. 20528

And to:

        Johnny Choate
        GEO Group, Inc.
        3130 N. Oakland Street
        Aurora, CO 80010

<u>s/ Laura P. Lunn</u>
*Director of Advocacy & Litigation*

<u>s/ Conor Gleason</u>
*Detention Program Senior Staff Attorney*

ROCKY MOUNTAIN IMMIGRANT ADVOCACY NETWORK
7301 Federal Boulevard, Suite 300
Westminster, Colorado 80030

*Pro Bono Counsel for Petitioner*
